hMAX N. TOBIAS, JR, Judge.
This appeal involves a wrongful death and survival action that alleges medical malpractice and loss of a chance of survival *938 claims arising from the death of Mrs. Joy-celyn Springer. The defendants, Robert D. Jeanfreau, M.D., Wallace E. Jeanfreau, M.D., and their insurer, Louisiana Medical Mutual Insurance Company, appeal from a trial court judgment rendered in favor of the plaintiffs, Cynthia Springer Thoulion, Dondnel Springer Shephard, Joy Springer Machado[1] and Federick J. Springer, III, individually and as Executor of the Estate of Frederick J. Springer, Jr.[2] The Louisiana Patient’s Compensation Fund (the “Fund”), an intervenor, also appeals.
Dr. Robert Jeanfreau, a board certified internist, testified that he first saw Mrs. Springer on 13 June 1990. She had a family history of lung cancer and coronary artery disease (“CAD”). Her father died from a myocardial infarction (“MI”) at age 57, and her sister had a MI and coronary artery bypass graft surgery at age 57. Mrs. Springer had been diagnosed with Raynaud’s syndrome three years earlier and treated with Procardia. Her chief complaint was an ulcer on her left fourth finger for two weeks. Dr. Jeanfreau noted that she had “tight” skin on her fingers and telangiectasia on her hands. At the time, she had no pulmonary or gastrointestinal symptoms. Dr. Jeanfreau diagnosed possible CREST[3] syndrome and prescribed Procardia, 10 mg twice a day. The CREST syndrome diagnosis Dwas confirmed by Mrs. Springer’s positive anti-centromere antibody and 9 July 1990 evaluations by Reginald D. Sanders, M.D., a rheumatologist.
On 20 June 1990, Mrs. Springer called Dr. Robert Jeanfreau, complaining that her hand was not better. Dr. Jeanfreau increased the Procardia dosage to 20 mg twice a day. Three days later he prescribed Augmentin, an antibiotic, for an infection in Mrs. Springer’s left ring finger. The following week, on 28 June 1990, he again increased the Procardia dosage to 20 mg three times a day for the hand pain. On 8 August 1990, Dr. Robert Jeanfreau started Mrs. Springer on Persantine, 50 mg twice a day.
Dr. Robert Jeanfreau testified that he next saw Mrs. Springer on 29 August 1990. She complained of retrosternal pain after eating for two weeks, which occurred after most meals, and told him elevating the head of her bed provided some relief. Mrs. Springer also complained of shortness of breath with exertion for several months. According to Dr. Jeanfreau, the pulmonary complications from CREST explained the shortness of breath. A chest x-ray showed no fibrosis, but Dr. Jean-freau explained that microscopic pulmonary fibrosis is not always evident on an x-ray of a patient with CREST syndrome. An electrocardiogram (“EKG”) was normal. Dr. Jeanfreau diagnosed Mrs. Springer as having “reflux esophagitis” and possible “pulmonary fibrosis.” Because she had stopped taking all the previously prescribed medications, Dr. Jean-freau prescribed Procardia XL, 60 mg once a day, Persantine, 50 mg twice a day, and aspirin, one a day. He also prescribed Nitrol 2% ointment for her finger tips.
On 24 September 1990, Dr. Robert Jean-freau had Mrs. Springer undergo an eso-phagram and upper GI series, both of which were normal, and pulmonary *939 | ¡Junction studies (“PFS”). The PFS indicated that her lung volumes were “mildly reduced. Airflow is reduced at the level of the small airway and improves after bron-chodilator administration.” Her defusion deficiency was 44% of the predicted value. According to Dr. Jeanfreau, the PFS results confirmed that Mrs. Springer had mild restrictive lung disease, which accounted for her shortness of breath. On 9 November 1990, Mrs. Springer called Dr. Jeanfreau complaining of a “dry cough” and he prescribed Robitussin DM.
Dr. Robert Jeanfreau next saw Mrs. Springer on 16 November 1990 who had complaints of swelling and pain in her right wrist. At the time, she also complained of exertional chest discomfort for several months. Because the chest discomfort had not increased in frequency or duration, Dr. Jeanfreau attributed it to the restrictive lung disease and shortness of breath on exertion related to CREST syndrome. His noted diagnosis was “CREST syndrome,” possible “gout,” and “hyperur-icemia.” He prescribed Feldene, one every day.
Dr. Wallace Jeanfreau, a board certified internist, testified that he saw Mrs. Springer for the first time on 8 January 1991 because Dr. Robert Jeanfreau was on active military duty overseas. Before he evaluated Mrs. Springer, he reviewed Dr. Robert Jeanfreau’s notes and was aware of Mrs. Springer’s prior complaints of ret-rosternal pain, exertional chest pain, and shortness of breath. In his opinion, these complaints were CREST related. At the time, Mrs. Springer complained of a cold, sinus, and hacking cough. She had a low grade fever and an ulcer on her left third finger. She had no complaints of chest pain, and a chest x-ray was negative for pneumonia. Dr. Jeanfreau prescribed Bactrim, an antibiotic, and continued Mrs. Springer’s other medications.
|4In mid-April 1991, Mrs. Springer called Dr. Wallace Jeanfreau with complaints of emotional stress, and he prescribed Valium. On 29 April 1991, she saw him with complaints of an inguinal rash. Dr. Jean-freau noted that her lungs were clear, her physical examination was otherwise unchanged, and she was under emotional stress. He testified that Mrs. Springer had no complaints of chest pain.
Dr. Wallace Jeanfreau testified that he saw Mrs. Springer for a third time on 2 July 1991. She informed him that she had eaten two waffles that morning, and about 10:30 a.m. began experiencing abdominal cramps, nausea, vomiting, and later diarrhea and weakness. The episode recurred 30 minutes later. Mrs. Springer told Dr. Jeanfreau that she experienced a sharp chest pain after vomiting. She also informed him that she had been under a great deal of emotional stress due to her children’s marital problems. Dr. Jean-freau conducted a physical exam, which indicated normal vital signs and was unremarkable. He diagnosed gastroenteritis from food poisoning.
Dr. Wallace Jeanfreau testified that at the 2 July 1991 office visit he had Mrs. Springer undergo an EKG while experiencing chest soreness to rule out a heart attack. The EKG disclosed a sinus rhythm, normal axis, and questionable poor “R” wave progression across the anterior chest leads. While these EKG findings differed from the August 1990 EKG results, Dr. Jeanfreau opined that the latest EKG showed no changes suggestive of either acute infarction or ischemia, and attributed the poor “R” wave progression to improper lead placement. Dr. Jean-freau diagnosed Mrs. Springer with viral gastroenteritis, prescribed Tigan for nausea and vomiting, and continued her other medications. He noted “Schedule stress test in the future” and instructed Mrs. *940 Springer to return to the office within a | Bmonth to schedule an exercise stress test to complete his evaluation. He explained to her that the stress test was needed to determine whether or not there was the presence of coronary ischemia and circulatory problems to the heart. According to Dr. Jeanfreau, Mrs. Springer understood the necessity of undergoing the stress test. At the time, he found no urgency to do a stress test because her EKG was normal, other than the poor “R” wave progression, which he had attributed to improper lead placement. Mrs. Springer did return in a month and did not undergo an exercise stress test.
Mrs. Springer returned to the Jean-freaus’ office on 14 November 1991 and saw Dr. Robert Jeanfreau, who had returned from military duty. Dr. Jeanfreau testified that before he examined Mrs. Springer, he reviewed Dr. Wallace Jean-freau’s notes from the 8 January 1991, 29 April 1991, and.2 July 1991 examinations and saw that she had no chest pain complaints, except after vomiting on 2 July 1991. In reviewing the EKG results,' he agreed that the 2 July 1991 EKG was different from August 1990 EKG but the EKG showed no acute ischemic changes. He agreed that the poor “R” wave progression was likely caused by poor lead placement.
At the 14 November 1991 visit, Mrs. Springer complained of nonproductive cough, fever for two weeks, and shortness of breath. After an examination, Dr. Robert Jeanfreau recorded “scleroderma; [questionable] esophageal involvement; cold.” Dr. Robert Jeanfreau prescribed a cough suppressant and Prilosec for the esophagitis. He, too, recommended that Mrs. Springer undergo a stress test.
On 19 November 1991, Mrs. Springer called the Jeanfreaus’ office and stated that the Prilosec relieved the pain. Dr. Robert Jeanfreau opined that the | ¡¡positive results from Prilosec indicated her chest complaints were esophageal in nature. He also prescribed Reglan at night, a drug that increases the lower esophageal sphincter tone to assist a more normal esophagus action.
On 27 November 1991, Mrs. Springer called the Jeanfreau’s office and said the Reglan was not helping. She complained to Dr. Robert Jeanfreau of chest pain after eating that subsided when sitting up. Dr. Jeanfreau discontinued the Reglan and prescribed Zantac, a drug similar to Prilo-sec, but less expensive.
Dr. Robert Jeanfreau next saw Mrs. Springer on 11 December 1991. She complained of retrosternal pain radiating to her back and of vomiting for one day. She reported having a similar, though less intense, pain during the previous month. Dr. Robert Jeanfreau admitted Mrs. Springer to Mercy Hospital with a diagnosis of chest pain secondary to esophageal disorder. The EKG upon admission disclosed a complete right bundle branch block and an acute anterolateral infarction (heart attack). The cardiac enzyme studies indicated that the attack occurred within two days of her admission to the hospital. Nicholas Pappas, M.D., a cardiologist, inserted a temporary pacemaker and heart catheter on 12 December 1991 and a permanent pacemaker on 17 December 1991.
During the hospitalization, Reginald D. Sanders, M.D., evaluated Mrs. Springer and found no progression of her CREST from his previous exam. Because Mrs. Springer continued to complain of chest pain, James J. McKinnie, M.D., her treating cardiologist, performed coronary aor-tography, which disclosed a two-vessel blockage. He also requested Steve Price, M.D., a gastroenterologist, to perform an esophagogastroduodenoscopy (“EGD”) to ascertain whether the chest pains might *941 have been due to esophagitis. Results from an EGD performed on 26 |7Pecember 1991 were normal. Five days later, on 31 December 1991, Mrs. Springer suffered another MI and died. Dr. Robert Jean-freau testified that her cause of death was arrhythmias, secondary to a MI, secondary to CAD.
Following Mrs. Springer’s death, plaintiffs filed a request for a medical review panel pursuant to La. R.S. 40:1299.41, et seq., alleging that Dr. Robert Jeanfreau and Dr. Wallace Jeanfreau were negligent in their care and treatment of Mrs. Springer. Specifically, plaintiffs alleged that the defendants failed to properly diagnose or treat Mrs. Springer’s CAD, which caused her to lose a chance of surviving her December 1991 heart attacks. They contend that the defendants treated Mrs. Springer’s chest pains as gastrointestinal (“GI”), rather than cardiac, in nature. They allege that, in the absence of GI pathology, defendants were obligated to pursue cardiac testing to determine the origin of Mrs. Springer’s chest pains, but failed to do so. The defendants’ failure to follow through on evidence of cardiovascular disease denied Mrs. Springer an accurate diagnosis of CAD at a point in time where successful bypass surgery would have extended her life span.
The Medical Review Panel found that the defendants had not breached the applicable standard of care and stated in its opinion:
1. The working diagnosis of esophagitis was a reasonable one.
2. On the August 27, 1990 and November 16, 1990 office visits, the patient was evaluated properly and the August EKG, although the copy is difficult to read, appears to be unchanged from 1988.
3. The EKG of July 2, 1991 possibly shows significant changes when compared with the prior tracing of August 27, 1990. The panel feels that the standard of care was met when the patient was requested to return in one month for evaluation and possible stress testing.
ls4. The records indicate the patient failed to return for this visit.
The plaintiffs subsequently filed suit. Following a judge trial, the trial court rendered judgment on 2 June 1999 in favor of the plaintiffs. In reasons for judgment, the trial judge stated that notwithstanding Mrs. Springer’s CREST related symptoms and normal August 1990 EKG, “the possibility of a cardiac problem should have been ever present when dealing with a patient with such significant risk factors.” The trial judge found that Dr. Robert Je-anfreau consistently treated Mrs. Springer’s chest pain as GI, rather than cardiac, in nature, his suspicion of esophagitis was never confirmed, and the CREST syndrome diagnosis did not exclude the possibility of heart disease. The trial judge determined that Mrs. Springer received adequate medical treatment until July 1991, when Mrs. Springer’s abnormal EKG was attributed to poor lead placement. He asserted that “[h]ad the stress test been scheduled and performed with exigency, perhaps the doctors conduct would not have risen to the level of a deviation from the standard of care.” Dr. Robert Jeanfreau compounded the problem, the trial judge found, by failing to address the possibility of cardiac disease at Mrs. Springer’s visit on 14 November 1991. The trial judge determined that cardiac testing and evaluation should have taken place between July 1991 and November 1991, and that “[t]he failure to timely diagnose and treat Mrs. Springer’s heart disease was a breach in the standard of care for both Drs. Jeanfreau.” Concluding the defendants’ negligence caused Mrs. *942 Springer to lose a chance of survival, the trial judge apportioned 60% of the fault to Dr. Robert Jeanfreau and 40% of the fault to Dr. Wallace Jeanfreau.
|nThe trial court awarded damages in the following amounts: $125,000.00 for survival damages on behalf of Joycelyn Springer; $75,000.00 for wrongful death damages on behalf of Mrs. Springer’s late husband, Frederick J. Springer, Jr.; $50,000.00 in wrongful death damages to each of Mrs. Springer’s adult children; and $61,232.45 for medical expenses for Mrs. Springer’s final illness. In addition, the court awarded legal interest from the date of judicial demand and court costs. Because the judgment, exceeded each defendant’s $100,000.00 limitation of liability, the Fund intervened in the litigation.
On appeal, in their first, third and fourth assignments of error, the defendants and the Fund argue that the trial court erred in finding that the Drs. Jeanfreau had breached the applicable standard of care and negligently treated Mrs. Springer. They argue that the trial court erred in relying on the speculative, unsupported testimony of plaintiffs’ experts, Jim. Hirschman, M.D., and Michael E. Kostel-nick, M.D., and failing to weigh more heavily the testimony of Drs. McKinnie, Robert and Wallace Jeanfreau, Mrs. Springer’s treating physicians. Their second assignment of error asserts that the trial court erred in finding that the defendants’ negligence caused Mrs. Springer to lose a chance of survival.
Medical malpractice is defined by La. R.S. 40:1299.41(A)(8) as:
any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading ánd unloading of a patient, and also includes all legal responsibility of a health care provider arising from defects in blood, tissue, transplants, drugs and medicines, or from defects in or failures of prosthetic devices,' implanted in or used on or in the person of a patient.
I ipLa. R.S. 9:2794 sets forth the burden of proof imposed upon a plaintiff in establishing a medical malpractice claim. The plaintiff must prove by a preponderance of the evidence:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La. R.S. 9:2794(A). Thus, the plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician’s alleged negligence and the plaintiffs injuries resulting therefrom. Pfiffner v. *943 Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94), 643 So.2d 1228.
The Louisiana Supreme Court in Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 721 (La.1986) held that in a wrongful death action alleging medical malpractice, the plaintiff need not prove that the patient would have survived if the defendant had undertaken preventive or other methods of treatment. Instead, the plaintiff may establish a compensable claim through evidence that 11T demonstrates a defendant’s malpractice resulted in the loss of a chance of survival of a patient who thereafter expired.
In support of their claim that the defendants’ failure to diagnose and treat their mother’s CAD constituted negligence and fell below the required standard of care, the plaintiffs offered at trial the expert testimony of Drs. Hirschman and Kostel-nick. Dr. Hirschman, an expert in internal medicine and cardiology, testified Mrs. Springer was obese, had elevated cholesterol levels, led a sedentary lifestyle, and had a family history of CAD, all factors placing her at high risk for CAD. In his opinion, the defendants breached the applicable standard of care in the following respects: (1) they failed to consider Mrs. Springer’s history of CAD; (2) they failed to monitor Mrs. Springer’s cholesterol level; (3) they failed to develop a differential diagnosis and concluded only that Mrs. Springer had esophagitis as a result of CREST; (4) they failed to consider the reports of the gastroenterologist who found there was no abnormality of the esophagus; (5) they failed to heed Mrs. Springer’s worsening symptoms; and (6) they failed to have Mrs. Springer undergo an exercise stress test shortly after the 2 July 1991 visit.
Dr. Hirschman testified that he never treated Mrs. Springer, but did review her medical records and found that the EKG performed on 2 July 1991 was abnormal and showed a change from the August 1990 EKG. The poor “R” wave progression on the July 1991 EKG indicated either a possible anterior wall infarction of unknown age, or scarring on the septum between the left and right ventricles. Dr. Hirschman testified that in view of Mrs. Springer’s risk factors, Dr. Wallace Jean-freau should have performed another EKG at the time to rule out of an old infarction. He also testified that Dr. Wallace Jean-freau, in recommending |12the exercise stress test, should have informed Mrs. Springer that she might have had an old infarction. In his opinion, an exercise stress test performed after 2 July 1991 most likely would have revealed CAD.
Dr. Hirschman also criticized Dr. Robert Jeanfreau’s November 1991 treatment of Mrs. Springer. He testified that Dr. Jean-freau should have had Mrs. Springer undergo a stress test regardless of her symptoms at the time because she had never followed through on Dr. Wallace Jean-freau’s earlier recommendation. By not ordering an exercisé stress test in November 1991, Dr. Robert Jeanfreau was playing the odds, Dr. Hirschman opined.
The angiogram in Mrs. Springer’s medical records from Mercy Hospital disclosed a two-vessel blockage. In Dr. Hirseh-man’s opinion, had her CAD been diagnosed and treated either medicinally or mechanically prior to the first MI, the MI that Mrs. Springer suffered could have been prevented and her chance of survival would have been 80-90%. He testified that available treatment options included arterial bypass, angioplasty, and medical management.
Dr. Kostelnick, an expert in internal medicine and gastroenterology, corroborated Dr. Hirschman’s testimony that the defendants breached the applicable standard of care of an internist. He reviewed *944 Mrs. Springer’s medical records and concluded that the defendants failed to timely diagnose and treat her CAD. Dr. Kostel-nick explained that 20% of all intensive care unit admissions are attributable to a physician’s inability to distinguish between esophagitis and angina. Considering that statistic, he testified that an objective exercise stress test was necessary to rule out CAD because Mrs. Springer had complained of both esophagitis and chest pain. Dr. Kostelnick agreed that the July 1991 EKG results |iawere abnormal and acknowledged that the poor “R” wave progression was compatible with, but not diagnostic of, an old MI. This being the case, he concluded Dr. Wallace Jeanfreau should have had Mrs. Springer undergo a stress test at the time and his failure to do so fell below the standard of care. In any event, Dr. Kostelnick concluded an exercise stress test performed prior to December 1991 would have revealed Mrs. Springer’s CAD. In his opinion, the defendants’ failure to timely diagnose Mrs. Springer’s CAD precluded her from obtaining proper treatment. He estimated a high, 90%, probability that Mrs. Springer’s MI, and subsequent death, could have been prevented with proper diagnosis and appropriate treatment.
The Drs. Jeanfreau, on the other hand, contend that they followed a reasonable and accepted school of medical management in their care and treatment of Mrs. Springer. They assert that they complied with the prevailing standard of care for an internist because their working diagnosis of CREST syndrome with esophagitis was reasonable, they included CAD in their differential diagnosis, and the standard of care did not require an exercise stress test or a referral to a cardiologist. In addition to their respective testimonies, the defendants presented the expert testimony of three other physicians, namely, Dr. McKinnie, Melville J. Sternberg, M.D., and Jay Shames, M.D., to defend against the plaintiffs’ claims.
Dr. McKinnie, testified that when Mrs. Springer was admitted into the hospital in December 1991, she did not have the “classic” type of chest pain where the heart muscle is deprived of blood flow. Her pain had a “burning” quality to it, suggesting an esophageal origin. He testified that the Drs. Jeanfreaus’ diagnosis of CREST was reasonable and appropriate and that they clearly considered CAD as a | ^differential diagnosis. In reviewing the 2 July 1991 EKG, he found that it showed no evidence of an infarction even in light of the poor “R” wave progression because the “ST” segments and “T” waves were unchanged from the earlier August 1990 EKG. This being the case, Dr. McKinnie agreed with the defendants’ conclusion that a stress test was not immediately necessary. In his opinion neither defendant had breached the standard of care of by not referring Mrs. Springer to a cardiologist in July 1991 or November 1991. He explained that not all chest pain or related symptoms are a basis for further cardiovascular testing. Dr. McKinnie concluded that Mrs. Springer was not a candidate for a cardiac catheterization in either 2 July 1991 or 14 November 1991 because she had viral gastroenteritis and a cold on those dates. Noting that Mrs. Springer had been prescribed aspirin, Procardia, and Persantine, drugs used for the treatment of CAD and angina, Dr. McKinnie stated that nothing in her records indicated that an angiogram in July 1991 would have detected a state of disease requiring more than these medications. He also testified that Mrs. Springer should have followed the recommendation of the defendants for an exercise stress test, but no one could predict the results with any degree of probability. However, on cross-examination, he admit *945 ted that an exercise stress would likely have disclosed CAD.
Dr. Sternberg, an expert in the field of internal medicine who specializes in pulmonary medicine, was a member of Medical Review Panel that ruled in favor of the defendants. Dr. Sternberg confirmed at trial that he and the other members of the Medical Review Panel found that the defendants had complied with the applicable standard of care for an internist. He testified that Mrs. Springer’s chest pain was due to her CREST related esophagitis rather than angina because it had |1Rfour distinct characteristics: (1) the chest pain was relieved by elevation of the head of Mrs. Springer’s bed; (2) the pain occurred after eating; (3) Mrs. Springer had no symptoms in the absence of late night eating; and (4) Mrs. Springer obtained relief from medicine, particularly Prilosec. Dr. Sternberg further testified that the defendants considered CAD as a differential diagnosis throughout their treatment of Mrs. Springer and attempted to identify a cardiac problem as they had her undergo EKGs while experiencing chest pains. He explained that Dr. Robert Jeanfreau had evaluated Mrs. Springer at several office visits over the course of several months, had the benefit of chest x-ray, PFS and EKGs, and was clearly aware of her family history. Thus, he concluded that Dr. Robert Jeanfreau was in the best position to know the true meaning of her complaints and symptoms. Dr. Sternberg, reviewing the 2 July 1991 physical examination and EKG that showed poor “R” wave progression, concluded that Mrs. Springer had not suffered a MI and, thus, Dr. Wallace Jean-freau acted reasonably in merely recommending a stress test at the time. He agreed with Dr. McKinnie that Mrs. Springer was not a candidate for an exercise stress test on 2 July 1991 or 14 November 1991 because she had a virus on one occasion and a cold with fever on the other.
Dr. Shames, board certified in internal medicine and pulmonology, was also a member of the Medical Review Panel that reviewed the plaintiffs’ complaint. He corroborated Dr. Sternberg’s testimony that the defendants had complied with the standard of care for an internist. After reviewing Mrs. Springer’s medical records, he concluded that the defendants had correctly diagnosed Mrs. Springer’s CREST. He explained that CREST patients generally have intermittent and/or exertional chest pains, the symptoms exhibited by Mrs.. Springer. He also noted that, | ^throughout her treatment by the defendants, Mrs. Springer had esophageal symptoms, esophagitis and esophageal dysmotility. Her positive response to Pri-losec was, in his opinion, strong evidence that her complaints were esophageal in origin. Also, Mrs. Springer’s exertional shortness of breath was due to her esophageal and pulmonary problems related to CREST.
According to Dr. Shames, contrary to the plaintiffs’ claims, the defendants’ failure to obtain cholesterol readings on Mrs. Springer from June 1990 to December 1991 was not a deviation from the standard of care of an internist. He also testified that the applicable standard of care did not require the defendants to chart CAD as a differential diagnosis even though they considered it in their treatment of Mrs. Springer. Specifically, Dr. Shames testified that he found the defendants’ charting of Mrs. Springer’s complaints, their diagnoses, and prescribed treatment and medications fully consistent with the applicable standard of care. Like the Drs. Jean-freaus, Sternberg and McKinnie, Dr. Shames concluded the 2 July 1991 EKG showed no acute ischemic changes and the abnormality-the poor “R” wave progres- *946 síon was likely due to improper lead placement. In his opinion, an exercise stress test was not required under the circumstances and Mrs. Springer certainly did not need a cardiac catheterization at that time. He explained that Mrs. Springer’s complaints of chest pain in July 1991 occurred after vomiting from acute food poisoning, indicating they were not cardiac in origin. Dr. Shames also agreed that due to her cold and fever, Mrs. Springer was not a candidate for a stress test on 14 November 1991.
An appellate court may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is Ir/conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Rosell v. ESCO, 549 So.2d 840 (La.1989); Dawes v. Kinnett, 99-3157, 99-3158, 99-3159 (La.App. 4 Cir. 1/17/01), 779 So.2d 978. Expert witnesses who are members of the medical profession are necessary sources of proof in medical malpractice actions to determine whether the defendant doctor possessed the requisite degree of skill and knowledge, or failed to exercise reasonable care and diligence. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991). The determination of an expert’s credibility is also a factual question subject to the manifestly erroneous/clearly wrong standard of review. Id.; Rosell v. ESCO, supra.
In determining that the defendants failure to timely diagnose and treat Mrs. Springer’s heart disease was a breach of the standard of care, the trial judge relied heavily on the testimony of plaintiffs’ experts, Drs. Hirschman and Kostelnick, that an exercise stress test should have been performed shortly after Mrs. Springer’s 2 July 1991 office visit in light of her abnormal EKG result. Specifically, the trial judge noted that the plaintiffs’ experts, as well as Dr. McKinnie and the defendants, all acknowledged at trial that a stress test performed after the 2 July 1991 “more probably than not would have revealed CAD.” As to causation, the trial judge accepted Dr. Kostelnick’s testimony that had CAD been timely discovered and treated following the 2 July 1991 visit, Mrs. Springer would have had a 90% survival rate.
Keeping in mind the standard for appellate review, after reviewing the evidence in the record, we find no error in the trial court’s finding that Drs. Robert and Wallace Jeanfreau were negligent in treating Mrs. Springer and that their 11Ractions deviated from the standard of care required of internists. In light of Mrs. Springer’s family history and other risk factors, at the very least Dr. Wallace Jeanfreau should have performed a second EKG on 2 July 1991 after the initial EKG disclosed poor “R” wave progression. Only then could he have ruled out a MI at that time. Both Drs. Wallace and Robert Jeanfreau recommended that Mrs. Springer schedule and undergo an exercise stress test. When she failed to do so, neither one of them followed up to emphasize the urgency of her undergoing the exam. Because the defendants knew that an exercise stress test more probably than not would have confirmed Mrs. Springer’s CAD, we agree with the trial court that they were negligent in treating her.
The defendants and the Fund in their sixth and fifth assignments of error, respectively, argue that the trial court’s award of $125,000.00 for Mrs. Springer’s survival damages is excessive. They assert that Mrs. Springer led an active and productive life, despite some esophagus-related discomfort, until the time she entered the hospital in December 1991. During her twenty-day hospitalization, she *947 received appropriate medical care and was not in acute pain. On 31 December 1991, Mrs. Springer suffered a sudden infarct at 10:13 p.m. and died at 10:37 p.m. Thus, the defendants and the Fund assert that Mrs. Springer suffered very little and urge this Court to reduce the survival damages to $60,000.00.
' Similarly, the defendants and the Fund also argue that the $75,000.00 wrongful death damages awarded to the estate of Mrs. Springer’s husband should be reduced to $45,000. They assert that the calculation of Mr. Springer’s loss resulting from his wife’s death must take into account that he died ten months after her death, a time during which he was often incapacitated. They point out that, |inshortly after Mrs. Springer’s death, Mr. Springer was diagnosed with malignant lung cancer that quickly spread to his throat and brain. As a result, Mr. Springer was bedridden the last two months of his life.
The correct standard for appellate review of a damage award is clear abuse of discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). That discretion is vast and should rarely be disturbed unless it is, in either direction, beyond that which a reasonable trier of fact could assess under the particular circumstances. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
In determining damages for a lost chance of survival, the factfinder may consider an abundance of evidence and factors, including evidence of percentages of chance of survival along with evidence such as loss of support and loss of love and affection, and any other evidence bearing on the value of the lost chance. Smith v. State, Dept. of Health and Hosp., 95-0038 (La.6/25/96), 676 So.2d 543, 549.
Here, the trial court considered the testimony of Cynthia Springer Thoulion and Joy Springer Lemoine, who vividly described the pain, impairment, and frustration their mother endured the last year of her life. They testified that she was severely limited in her daily activities and could no longer cook, clean, shop, and baby sit, as she once did. According to them, Mrs. Springer followed the doctors’ orders, taking her prescribed medications that occasionally provided relief, but her chest pains continued to recur. We also note that the trial court had the benefit of the medical records that clearly disclose the discomfort and pain that [?,nMrs. Springer withstood undergoing several diagnostic and surgical procedures during her December 1991 hospitalization.
All four Springer children testified that they had a close, loving family. They described their mother as a devoted, loving wife and mother, who spent 90% of her time with her husband. Mr. Springer, they asserted, grieved heavily over the loss of his wife. His terminal illness and final months of life were extremely difficult without Mrs. Springer.
After reviewing the evidence in the record, we find the trial court did not abuse its vast discretion in awarding $125,000.00 for Mrs. Springer’s survival damages and $75,000.00 for wrongful death damages to Mr. Springer’s estate.
Finally, in their fifth assignment of error, the defendants, Drs. Robert and Wallace Jeanfreau, argue that the trial court’s judgment should be amended to include language that they are not liable for any amount in excess of a total of $100,000.00. Specifically, they contend that La. R.S. 40:1299.41, et seq. limits their liability to $100,000.00 because “[Drs. Rob *948 ert Jeanfreau and Wallace Jeanfreau] practiced together and provided care and treatment to Mrs. Springer as a team, working from the same office and same practice.” The Fund, on the other hand, contends that pursuant to La. R.S. 40:1299.41, et seq. and the related jurisprudence, Dr. Robert Jeanfreau and Dr. Wallace Jeanfreau are each liable for $100,000.00, for a total of $200,000.00, plus interest and court costs. The Fund concedes that it is responsible for any award in excess of $200,000.00 plus interest and costs up to the $500,000.00 limit of liability in the event the trial court’s judgment is upheld on appeal.
laiWe find no merit to the defendants’ argument that this is not a case of two physicians providing independent treatment to a patient merely because the defendants practiced together and shared office space or that Dr. Wallace Jeanfreau only covered for Dr. Robert Jeanfreau, who was called to military duty overseas. The evidence in the record indicates that Mrs. Springer presented herself with ret-rosternal chest pains in addition to other complaints to Dr. Robert Jeanfreau and Dr. Wallace Jeanfreau on separate occasions and each treated her independent of the other. Both physicians discussed the necessity of Mrs. Springer’s undergoing an exercise stress test but failed to timely schedule the exam.
La. R.S. 40:1299.42B(2) provides that:
A health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars [$100,000.00] plus interest thereon accruing after April 1, 1991, for all malpractice claims because of injuries or death of any one patient.
The unambiguous language of the statute states that it applies only to “[a] health care provider.” Furthermore, La. R.S. 40:1299.42B(3)(a) provides:
Any amount due from a judgment ... which is in excess of the total liability of all liable health care providers, as provided in Paragraph (2) of this Subsection, shall be paid from the patient’s compensation fund pursuant to the provision of R.S. 40:1299.44(0).
This language contemplates that when multiple health care providers are liable, the Fund is responsible only for the excess of their “total liability.” It does not provide that the Fund is responsible for all amounts in excess of $100,000.00. Nor does Section 1299.42B(3)(a) restrict the liability of all responsible health care providers in a single medical malpractice action to a single $100,000.00 limit of liability.
L/The Louisiana Supreme Court in Stuka v. Fleming, 561 So.2d 1371, 1373 (La.1990), succinctly explained:
The Medical Malpractice Act, enacted by La. Acts 1975, No. 817, provides a scheme for compensation of medical malpractice victims who have been injured by qualified health care providers. Section 1299.42B(2) limits the liability of a single qualified health care provider to $100,000 for the injury to or death of any one person. Under Section 1299.42B(3) damages in excess of the total liability of all liable health care providers, up to $500,000, are to be paid by the Fund. Thus, according to the Act, if a suit is tried against two health care providers and a definitive judgment is rendered holding each legally responsible for the victim’s damages which are found to exceed $200,000, the liability of each health care provider is $100,000, and the potential liability of the Fund is $300,000, with a total recoverable amount of $500,000. (FN7). See Kelty v. Brumfield, 534 So.2d 1331 (La.App. 4th Cir.1988), cert. denied, 536 So.2d 1221(1989).
*949 Thus, in view of the clear statutory language and the related jurisprudence, the defendants are not entitled to a judgment limiting their total liability to $100,000.00.
Accordingly, for the above reasons, the trial court judgment is affirmed.
AFFIRMED.

. After the filing of the original petition, -Joy Springer Machado remarried. She is referred to as Joy Springer Lemoine in the trial transcript.

. The four named plaintiffs are Mrs. Springer's adult children. Frederick J. Springer, Jr., plaintiffs' father and Mrs. Springer’s husband, died ten months after his wife.

.CREST is an acronym for Calcinosis, Ray-naud’s syndrome, Esophageal dysmotility, Sclerodactyly, and Telangiectasis.