983 So.2d 231 (2008)
Carolyn LEWIS, Individually and on Behalf of Her Minor Children, Sharandall Mallie Lewis and Randall Lewis, Jr., and Schenita Michelle Lewis,
v.
The STATE of Louisiana, MEDICAL CENTER OF LOUISIANA AT NEW ORLEANS (Charity Hospital), Through the Board of Supervisors at Louisiana State University and Mechanical College, et al.
No. 2007-CA-0546.
Court of Appeal of Louisiana, Fourth Circuit.
April 16, 2008.
*232 James C. Klick, Joseph A. Kott, Herman, Herman, Katz & Cotlar, for Plaintiff/Appellee.
Charles C. Foti, Jr., Attorney General, Robert Angelle, Special Assistant Attorney General, Metairie, Louisiana, for Defendant/Appellant.
Court composed of Judge JAMES F. McKAY III, Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE.
JAMES F. MCKAY, III, Judge.
The State of Louisiana, Medical Center of Louisiana, et al ("appellants"), appeal the judgment of the trial court in favor of Carolyn Lewis, individually and behalf of her minor children ("appellees"). We find that a factual basis exists to support the trial court's judgment. The record establishes that the trial court's judgment is not clearly wrong or manifestly erroneous. Therefore, we affirm the judgment.
*233 FACTS AND PROCEDURAL HISTORY
This medical malpractice case arises out of a wrongful death/survival action filed by the appellees. On July 24, 2003, the Medical Review Panel consisting of three oral surgeons convened and unanimously found that there was no breach in the standard of care. After the Medical Review Panel had concluded, the appellees filed a wrongful death/ survival claim in the district court which was tried on October 18, 19, and 23, 2006, pursuant to the provisions of the Malpractice Liability for the State Services Act, La. R.S. 40:1299.39, et seq. At the conclusion of the trial, the district court took the matter under advisement and ultimately rendered judgment with reasons on December 11, 2006. The trial court found in favor of the appellees and against the appellants in the sum of $1,834,914.31, reduced to the statutory cap of $500,000.00.[1] It is from this judgment that the State appeals.
The decedent, Randall Lewis, respectively husband and father of the appellees, entered Charity Hospital on the morning of August 29, 2001 for a bilateral jaw surgery, known as an intraoral vertical ramus osteotomy (IVRO), to correct a misalignment of Mr. Lewis's jaw caused by a traumatic blow to his jaw during a fight in December of 2000. The surgery was successfully performed. As the trial court noted in its reasons for judgment, "The surgical procedure was completed with no apparent complications." During the surgery, lateral laceration incisions were made on each side of the jaw bone from the inside of the mouth in order to reposition the jaw; the incisions inside the mouth were sutured and the upper and lower jaws wired together in order to fixate the jaw so that the wound would heal. After surgery, at 10:20 a.m., Mr. Lewis was admitted to the post anesthesia care unit (PACU), where it was discovered that he had an elevated blood pressure.[2] To treat this problem, at 10:40 a.m. and again at 12:45 p.m., he was administered Apresolin, a short term anti-hypertension medication. He received no further hypertension medication after 12:45 p.m.
At 6:30 p.m. he was transferred to the surgical intensive care ward (SICA) where he remained until he was discharged the following day on August, 30, 2001. It is asserted that he was in stable condition during his entire stay in the SICA. At about 5:00 p.m., the day after the surgery, he was transferred from SICA to the discharge floor. At 5:30 p.m., Dr. Darling, one of Mr. Lewis's surgeons, signed Mr. Lewis's discharge order. Upon discharge, Mr. Lewis received a clipping device to cut the wires in his mouth, should the need arise. Despite being officially discharged at 5:30 p.m., an incident arose in which the hospital either lost or misplaced Mr. Lewis's keys and wallet, which delayed his leaving the hospital; he remained at the hospital until 6:30 p.m. After his belongings were located, Mr. and Mrs. Lewis left the hospital and began walking along Tulane Avenue to their car on Claiborne Avenue, when he began to hemorrhage profusely from his mouth. They immediately entered the LSU Clinical Education Building at 1542 Tulane Avenue. Despite attempts to help him, including CPR administered by Mrs. Lewis, he died at approximately 6:41 p.m. This wrongful death/survival action arose from that death.
STANDARD OF REVIEW
In Salvant v. State, 2005-2126 (La.7/6/06), 935 So.2d 646, the Louisiana *234 Supreme Court reiterated that the standard of review for factual findings in medical malpractice cases is the manifest error or the clearly wrong standard. In other words, in order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous.
The appellants raise four assignments of error which are all ostensibly factual findings and will be reviewed pursuant to a clearly wrong manifestly erroneous standard of review.
ASSIGNMENTS OF ERROR ONE AND THREE
In appellants' assignments error one and three they argue that the trial court erred in finding that the breach of the standard of care by Marilyn Douglas, RN caused or contributed to the death of Randall Lewis and that the Charity Staff could have or should have treated Mr. Lewis for his hypertension at 5:00 p.m. before his discharge. As these assignments of error are inextricably intertwined they will be addressed together.
DISCUSSION
In a medical malpractice action the plaintiff shall have the burden of proof pursuant to La. R.S. 9:2794(A).
La. R.S. 9:2794(A) The state's medical malpractice statute, in pertinent part states:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., . . . the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
"Thus, according to La.R.S. 9:2794(A), any medical malpractice claimant must establish, by a preponderance of the evidence: (1) the defendant's standard of care; (2) the defendant's breach of that standard of care; and (3) a causal connection between the breach and the claimant's injuries." Browning v. West Calcasieu Cameron Hosp., 03-332, p. 10 (La.App. 3 Cir. 11/12/03), 865 So.2d 795, 804 (citing Pfiffner v. Correa, 94-924, 94-963, 94-992 (La.10/17/94), 643 So.2d 1228).
On August 30, 2001, the day of Mr. Lewis's death, Marilyn Douglas, was the nurse on the discharge floor at Charity Hospital. When Mr. Lewis arrived at her unit at approximately 5:00 p.m. she and a student nurse took his vital signs, which were respiration rate of 16 per minute, pulse rate of 72 and blood pressure rate of 179/88. These signs were charted and inadvertently *235 recorded in the 4:00 a.m. slot on the form.
Prior to 5:00 p.m., when Dr. Darling signed Mr. Lewis's discharge order, it was discovered that Mr. Lewis' personal belongings, his keys and wallet, could not be located. Gina Bernard, the nurse who brought Mr. Lewis from SICA to the discharge unit, reported to Nurse Douglas that she attempted to locate these belongings to no avail and that Mr. Lewis was upset over the incident. This incident delayed Mr. Lewis' leaving the hospital upon his discharge. Nurse Douglas went to the 8th floor of Charity Hospital to look for the missing belongings. She testified that at 5:00 p.m. Mr. Lewis appeared upset over the loss of his valuables. At 6:20 p.m. she returned to the discharge unit and informed Mr. Lewis that his belongings were located, but that a key to the box where his belongings were stored would not be available until the next day. She testified that at that time Mr. Lewis did not appear to be upset. It was at approximately 6:30 p.m. that Mr. and Mrs. Lewis left the discharge unit: Nurse Douglas wrote on the Patient Discharge/Teaching Instructions form the vital signs taken at 5:00 p.m. and indicated that the time of discharge was "18:30", which she gave to Mr. and Mrs. Lewis.
The appellants argue that it was error for the trial court to find that Nurse Douglas' actions were a breach in the standard of care. In its Reasons For Judgment, the trial court concluded that the surgical procedure had been completed with no apparent complications. The trial court found no fault or breach of the standard of care on the part of Mr. Lewis's surgeons, Dr. Marchena and Dr. Darling. The court also found that Marilyn Douglas, RN, had breached the standard of care by failing to identify a potentially dangerous situation, namely the blood pressure reading of 179/88[3] at 5:00 p.m. on August 30, 2001, failing to communicate the elevated pressure to the physicians, and failing to comply with discharge procedure by failing to retake Mr. Lewis's vital signs when he left the hospital at 6:30 p.m.; as a result of this breach in the standard of care Mr. Lewis lost his life and a reasonable opportunity to survive.
Nurse Douglas testified that she did not retake his blood pressure at or around 6:30 p.m., but merely copied the vital signs previously taken. She testified that she did not retake his vital signs despite her concerns over his 5:00 p.m. vital signs and her knowledge that he was nervous and aggravated over the loss of his wallet and keys. She further admitted that his blood pressure at 5:00 p.m. was significantly higher than his previous taken while Mr. Lewis was in SICA. Furthermore, she failed to inform the discharging doctor, Dr. Darling, of this elevated blood pressure prior to his signing the discharge papers. Dr. Darling testified that had Nurse Douglas made him aware of Mr. Lewis' elevated blood pressure he would have continued to monitor the blood pressure before discharging him and would have likely sought a consult regarding the elevated blood pressure.
Two of the Medical Review Panel members, Dr. Fournet and Dr. Duvigneaud, despite finding that there was no breach in the standard of care, gave testimony that supported the conclusion that Nurse Douglas's negligence in failing to monitor Mr. Lewis's blood pressure upon discharge, failing to inform physicians of this elevated *236 blood pressure, and failing to control the elevated blood pressure before discharge, was a substantial causative factor in Mr. Lewis's death. Dr. Leon Fournet, professor of oral surgery at Charity, testified that a principal factor that ultimately led to Mr. Lewis's death was the unsuccessful attempts by Mr. Lewis and Mrs. Lewis to use the wire cutters to open his mouth so that he would not drown in his own blood. Dr. Duvigneaud, opined that elevated blood pressure could "blow off the clot" and in this case could have resulted in Mr. Lewis's death. Doctors, Fournet, Darling and Marchena all testified that if they had been informed at 5:00 p.m. of Mr. Lewis' elevated blood pressure they would have monitored the condition.
Based on these and other expert witnesses' testimony and the evidence, the trial court found that "the preponderance of credible evidence supports the conclusion that Nurse Douglas failed to comply with that standard of care prior to Mr. Lewis' discharge. Based on the record before this Court we agree with the trial court's determination that Nurse Douglas breached the standard of care and this breach cost Mr. Lewis his last chance to survive and his life.
As to the State's argument that Nurse Douglas had no duty to continue monitoring Mr. Lewis's blood pressure after Dr. Darling had issued his order of discharge at about 5:00 p.m., the trial court dismissed this argument as being contrary to the evidence. We agree.
For all purposes this patient was officially discharged from Charity when Dr. Darling signed the discharge order at approximately 5:30 p.m. At that point Mr. Lewis was free to go and his official hospital stay was over. Arguably, it is not incumbent upon the hospital staff to continue taking a patient's vital signs while the patient waits for personal belongings, a ride, etc., unless of course the patient exhibits some sign of distress or a notable change in condition. Based on the record there were no visible signs to alert the medical staff that Mr. Lewis's condition had changed during the time that he was technically discharged at 5:30 p.m. and 6:30 p.m. when he actually left Charity's premises. This argument, continued monitoring, is not necessarily germane to the issue of a breach in the standard of care. The breach had already occurred when Nurse Douglas failed to take a current reading of Mr. Lewis's vital signs immediately before Dr. Darling signed the discharge order. Therefore, it is unnecessary to address if Nurse Douglas or the hospital had a continued duty to monitor Mr. Lewis's blood pressure/vital signs post discharge.
Therefore, it is reasonable to conclude that by a preponderance of the evidence the defendants breached the standard of care, which reached the level of medical malpractice and that this breach in the standard of care can clearly be causally connected to Mr. Lewis's death and last chance for survival.
ASSIGNMENT OF ERROR TWO
The appellants argue that the trial court erred in finding that the bleeding originated from the surgical site. The thrust of the appellants' argument here, as well as the other assignments of error, is premised on the assertion that under a theory of causation it was never clearly proven that any of the post surgical actions or inactions by the doctors or nurses involved in his surgery and care could be the causative factor in Mr. Lewis's death and are supposition. They relied on the testimony of a number of experts/physicians and assert that there was never conclusive evidence as to the source or cause of Mr. Lewis's oral hemorrhaging. They assert that there were merely theories to explain the cause and site of the bleeding *237 and that these theories are merely possibilities and speculation, hence, nothing conclusive was ascertainable. In other words the fact that bleeding occurred with this type of surgery in of itself in not evidence of anyone's fault.
Mr. Lewis's Death Certificate indicates that the cause of death was asphyxia due to occluded airway secondary to dissecting hemorrhage and post operative status. The Autopsy Report list asphyxia due to occluded airway secondary to dissecting hemorrhage involving the subclaneous fat between the strap muscles of the neck and bilateral aryepiglottic folds (right greater then left), submucosa of the right epiglottis edema of the right true and false vocal cords.
The trial court in its Reasons for Judgment made factual determinations after hearing expert testimony and drew the conclusion that Mr. Lewis's hemorrhaging came from the surgical site.
The State of Louisiana challenges the issue of causation on essentially two arguments. First, the State contends that there was no absolute proof that the blood hemorrhage came from Mr. Lewis'[sic]s surgical site, In this regard, the State relies in large part upon the Autopsy Report and its failure to identify the specific arteries or vessels or source of the bloody hemorrhage. Despite the absence of documented evidence pertaining to the exact vessel that had hemorrhaged, several of the medical experts testified that it was more probable than not the hemorrhage occurred at the surgical site. The type of surgery performed resulted in significant disruption of both blood vessels and bone in the area of Mr. Lewis'[sic]s mouth. The report of Officer LeBeaud[4] and Mrs. Lewis's testimony indicated the Mr. Lewis was "bleeding profusely from the mouth" and the Autopsy Report, while not specifically identifying the particular blood vessels, indicates that the hemorrhage came from the area of the surgical site. Given all of this testimony, medical experts testified that it was more probable than not the hemorrhage did, in fact, occur in the area of the surgical site.
After a careful review of the record, and given all of the testimony and evidence, it is reasonable to conclude, as did the trial court, that the surgical site was indeed the source of the hemorrhaging which ultimately led to Mr. Lewis's death. Pursuant to the manifestly erroneous/clearly wrong standard of review it is incumbent upon this Court not to substitute our own determination for those of the trial court trial. Therefore, we will not disturb these findings on appeal.
ASSIGNMENT OF ERROR FOUR
In its fourth and final assignment of error the state asserts that the trial court erred in awarding excessive damages for the loss of a chance of survival action.
The standard of appellate review of a damage award is clear abuse of discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). The Supreme Court addressed the standards governing appellate review of general damage awards in Andrus v. State Farm Mutual Auto. Ins. Co., 95-0801 (La.3/22/96), 670 So.2d 1206. Specifically, the Supreme Court stated:
In appellate review of general damage awards, the court must accord much discretion to the trial court judge or jury. Reck v. Stevens, 373 So.2d 498 (La.1979). The role of an *238 appellate [XXXX-XXXX La.App. 4 Cir. 6] court in reviewing awards of general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trial court. Id. Only if the reviewing court determines that the trial court has abused its "much discretion" may it refer to prior awards in similar cases and then only to determine the highest or lowest point of an award within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976).
Because discretion vested in the trial court is "great," and even vast, an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Andrus v. State Farm Mutual Auto. Ins. Co., 95-0801 (La.3/22/96), 670 So.2d 1206, 1210. This Court similarly held that "[a] general damage award assigned by a jury, although high or low, that does not shock the conscience should not be touched by an appellate court in light of the vast discretion that a finder of fact is granted in matters of general damages; the same applies to a general damage award of a trial judge." Andrews v. Dufour, XXXX-XXXX (La.App. 4 Cir. 6/2/04), 882 So.2d 15. This Court has further stated that "[i]n determining damages for a lost chance of survival, the factfinder may consider an abundance of evidence and factors, including evidence of percentages of chance of survival along with evidence such as loss of support and loss of love and affection, and any other evidence bearing on the value of the lost chance." Thoulion v. Jeanfreau, XXXX-XXXX (La.App. 4 Cir. 6/20/01), 794 So.2d 936, citing, Smith v. State Dept. of Health and Hosp., 95-0038 (La.6/25/96), 676 So.2d 543, 549. Moreover, "An award for damages must be reviewed in a light most favorable to the party who prevailed at trial." Harvey v. State, Dept. of Transportation and Development, XXXX-XXXX, p. 10 (La.App. 4 Cir. 9/26/01), 799 So.2d 569, 576.
In the instant matter, the appellants' argument is a somewhat disingenuous in that in the written and signed judgment there is no actual award for loss of chance of survival. In fact the language "loss of chance of survival" only appears in the Reasons For Judgment in the context of causation of death. As quoted from the Reasons For Judgment, "The Court finds that the testimony of plaintiffs' experts, Dr. Sachs and Dr. Snyder, to be convincing and to have established by a preponderance of the evidence that the breaches of the standard of care by Nurse Douglas were a legal cause of Mr. Lewis' death and caused him to lose a reasonable opportunity for survival."
When taken contextually and reviewing the trial court's entire Reasons For Judgment there is clearly no abuse of discretion in the trial court's damage award.
The trial court considered all of the evidence, which illustrated the pain and suffering Mr. Lewis endured prior to his death, as well as the damages suffered by his wife and children. Applying standards recognized above in the present case, and after reviewing the award of damages in light most favorable to the appellees, we find no abuse of discretion in the trial court's $1,834,914.31 award of general damages, which was reduced statutorily to *239 $500,000.00. Accordingly, the trial court did not abuse its discretion in ultimately awarding $500,000.00 in damages to the appellees. Because we find there is no abuse of discretion, we affirm the award.
CONCLUSION
For the reasons assigned, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] The judgment was cast entirely against the State of Louisiana.
[2] Mr. Lewis had a history of hypertension before entering Charity Hospital.
[3] The trial court noted that the discharge sheet documented Mr. Lewis' blood pressure at 179/88.
[4] Officer Wade LeBeaud was stationed in the LSU Clinical Education Building at 1542 Tulane, where Mr. & Mrs. Lewis entered for assistance after Mr. Lewis began hemorrhaging. Officer LeBeaud called 911 and requested medical assistance.